**The STATE of Ohio**

v.

**ANEZ.**

Court of Common Pleas of Ohio,
Hancock County.

No. 99–167–CR.

Decided June 16, 2000.

20

**22**

*Robert A. Fry,* Hancock County Prosecuting Attorney, and *Mark C. Miller,* Assistant Prosecuting Attorney, for the state.

*Thomas D. Drake,* for defendant.

REGINALD J. ROUTSON, Judge.

## Procedural History

This matter came on for consideration by the court pursuant to a motion to suppress, or, in the alternative, motion *in limine*, filed by the defendant on January 4, 2000. In response thereto, the state of Ohio filed a memorandum in opposition to the defendant's motion to suppress on February 1, 2000. The matter came on for an evidentiary hearing on March 15, 2000, and again on April 13, 2000. At the conclusion of the April 13, 2000 hearing, the court afforded both parties until April 28, 2000 to file supplemental memoranda. Neither party did so. Based upon the materials supplied by the parties, and the testimony adduced at both hearings, the court finds as follows.

## Operative Facts

On September 25, 1999, at approximately 3:00 a.m., Ohio State Highway Patrol Officer Christopher Martin Brock was operating his cruiser eastbound on State Route 12 near the village of Arcadia, Ohio. Seated next to Trooper Brock was Trooper A.K. Leitenberger, who was supervising Brock since the latter was still in training. The attention of both troopers was drawn to a vehicle traveling directly in front of their cruiser. This vehicle, identified as a green Saturn, drifted left of the center line and quickly drifted over the right edge line twice. According to Brock, the vehicle traveled completely off the roadway to the right before coming back into its lane of travel. Based upon these observations, Trooper Brock activated his pursuit lights and brought the vehicle to a stop. Trooper Brock testified that he could see two individuals in the vehicle. Trooper Brock exited his vehicle and made an approach to the vehicle on the passenger side to inquire of the driver. Trooper Leitenberger remained in or near the cruiser but continued to observe the situation, to assist if necessary. As Trooper Brock spoke with the operator of the vehicle, later identified as the defendant, Casimiro Anez III, he noticed a strong odor of alcoholic beverage coming from inside the car. He asked the driver if he had been drinking and received a positive response. Trooper Brock also noted that the driver's eyes were "kind of red, kind of glassy" and that his speech was slightly slurred. Trooper Brock asked the driver to step from the vehicle to perform some field sobriety tests. The driver agreed, and, after he exited the vehicle, Trooper Brock noted a strong odor of alcohol coming from the defendant as they continued to converse. Trooper Brock performed the horizontal gaze nystagmus test on the defendant and obtained six clues from six separate branches of the test, suggesting a strong probability that the defendant was operating his vehicle under the influence of alcohol.

Trooper Brock's cruiser was equipped with a videotape machine. The video portion of the taping machine was operational on the night in question; however, due to mechanical difficulties, the audio portion of the taping machine was not in working order. As part of the evidence, the state introduced the videotape of these events. A further review of the videotape indicates that Trooper Brock performed a vertical gaze nystagmus test on the defendant noting additional signs of intoxication.

After completion of the horizontal and vertical gaze nystagmus tests, Brock asked the defendant to perform the walk-and-turn test and the one-leg, stand-divided-attention-skills test. Upon completion of these tests, Trooper Brock concluded that the defendant performed poorly. Finally, the defendant submitted to a portable breath test administered by Trooper Leitenberger, with a result of 0.12, or approximately twenty percent over the lawful limit for a sample of breath.

Utilizing this information, Trooper Brock concluded that the defendant was under the influence of alcohol and arrested him for the operation of a vehicle while under the influence of alcohol. He testified that at approximately 3:16 a.m. he informed the defendant of his constitutional rights, handcuffed him, and placed him into the back of the cruiser.

At some point during the arrest process, Trooper Leitenberger answered a dispatch from the Ohio State Highway Patrol indicating that the vehicle they had stopped was the same vehicle mentioned in a previous bulletin or "bolo" (be on the lookout). This vehicle reportedly was involved in an incident near Brandy's nightclub in Findlay, Ohio, where the driver and/or the occupants of this vehicle had brandished weapons. Some of this same information had been broadcast earlier to Brock and Leitenberger, but they testified that they had failed to make the connection until the later dispatch.

Although Trooper Brock had pulled the defendant's vehicle off to the side of the road and locked it at the defendant's request, due to the new information, he returned to the vehicle to search it for weapons at the direction of his coach. A search of the internal compartments of the vehicle uncovered a loaded 9 mm handgun and drug paraphernalia located under the driver's seat. A search of the trunk unveiled an AR–15 rifle, magazines, and ammunition.

The state also adduced information from Findlay City Police Officer Matthew Tuttle. Officer Tuttle explained that on the night in question, three individuals came to the station at approximately 2:20 a.m. to report an incident near Brandy's nightclub. The main complainant, Linda Oswald, explained that a pistol and rifle had been pointed at her and the occupants of her vehicle on Adams Street in the city of Findlay. Oswald explained that she had been at Brandy's nightclub in the evening and that an argument broke out between her friends and

a group of Hispanic males. The group left Brandy's, but according to Oswald, the Hispanic males indicated that they would return to "finish the job." Oswald explained that they entered a green Saturn vehicle, which she decided to follow. While in pursuit of the green Saturn, she told Officer Tuttle that the occupants of the vehicle pointed weapons at her and her passengers. Oswald gave Tuttle her name, address, and the license plate number of the green Saturn. Officer Tuttle ran a check on the license plate, which came back to a 1995 Saturn registered to Casimiro Anez, later identified as the defendant. Her story was supported by two other witnesses, her daughter, Kimberly Oswald, and a friend, Rachel Grey. Officer Tuttle provided this information to the Findlay Police Department dispatch office so it could be distributed to all law enforcement agencies in the area. Officer Tuttle explained that he had no reason to doubt the testimony of Oswald and had no prior contact with her. This information as gleaned by Officer Tuttle served as the basis for the police dispatch that Trooper Brock used to support his search of the defendant's vehicle on State Route 12.

Defendant now challenges the stop of his motor vehicle, his arrest for the operation of the vehicle while under the influence of alcohol, and the warrantless search of his vehicle. In response, the state of Ohio contends that the actions of Troopers Brock and Leitenberger were reasonable under the circumstances, that Trooper Brock possessed a reasonable and articulable suspicion to stop the defendant's motor vehicle, that there was probable cause to arrest the defendant for the operation of a motor vehicle while under the influence of alcohol, and that there was probable cause or other justification to search the internal compartments of the vehicle and the trunk.

The defendant was charged with carrying a concealed weapon, as proscribed by R.C. 2923.12.

The court will address each of these issues individually.

## Burdens of Production and Persuasion

A defendant bears the initial burden of providing the state with adequate notice of grounds for challenging a warrantless search or seizure. In Ohio, it is incumbent upon a party seeking to suppress evidence to file a timely motion to suppress in accordance with Crim.R. 12 and 47. Thereafter, the state bears the burden of producing evidence on the issues raised and persuading the court by a preponderance of the evidence that the officer's actions were justified and that the search or seizure was lawful. See *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889; *Bourjaily v. United States* (1987), 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144.

## Reasonable Grounds to Stop

The cornerstone of the Fourth Amendment is the right of the people to be free from unreasonable seizures and searches. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment, even when the purpose of the stop is limited to a traffic violation and the resulting detention is brief. To justify an investigatory detention, based upon an observation of a traffic violation, a police officer must establish the existence of specific and articulable facts. These facts, in conjunction with the rational inferences therefrom, must, in light of the totality of the circumstances, justify a reasonable suspicion that the person who was stopped was involved in illegal activity, including the violation of traffic offenses. See *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. See, also, *State v. Rusnak* (1997), 120 Ohio App.3d 24, 696 N.E.2d 633; *State v. Wireman* (1993), 86 Ohio App.3d 451, 621 N.E.2d 542.

The constituents of reasonable and articulable suspicion cannot be precisely defined. This determination encompasses examination of all the facts, observations, and knowledge of circumstances in possession of the officer at the time of the stop. Generally, the observation of one or more traffic violations is sufficient to provide an officer with a reasonable and articulable suspicion to justify the stop of a motor vehicle. In *Wireman*, the Third District Court of Appeals found that a driver's inability to operate a vehicle within marked lanes of travel justified an investigative stop. *Id.*, 86 Ohio App.3d at 454, 621 N.E.2d at 544.

In this case, Trooper Brock testified that he observed the defendant drift left of the center line on one occasion and go right of the edge line on two separate occasions. Trooper Brock specifically testified that at one point, the entire vehicle was right of the right-edge line. In general, his testimony was supported by the observations of Trooper Leitenberger. Based upon these unrefuted observations, the court finds that Trooper Brock possessed a reasonable and articulable suspicion that the defendant had violated two separate traffic statutes, thereby justifying the stop of the defendant's vehicle.

## Reasonable Grounds to Request Field Sobriety Tests

Once a motorist is stopped, his or her detention can last only so long as is necessary to effectuate the original purpose of the stop. See *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237; *State v. Correa* (1995), 108 Ohio App.3d 362, 670 N.E.2d 1035. A request made of a validly detained motorist to perform field sobriety tests is generally outside the scope of the original stop, and must be separately justified by other specific and articula-

ble facts showing a reasonable basis for the request. While the facts that served as an impetus for the stop may also assist in providing this separate justification, additional facts are also necessary. This does not mean that an officer must have probable cause to believe that the motorist is under the influence of alcohol to request field sobriety tests, but only that the officer possess a reasonable and articulable suspicion to believe that the driver may be impaired. Among the factors an officer may consider are the following: time of day of the stop; location of stop; any indicia of erratic driving before the stop that may indicate a lack of coordination; condition of a suspect's eyes; impairment of suspect's ability to speak, odor of alcohol coming from interior of the car, or, more significantly, on the suspect's person or breath; intensity of alcoholic odors; suspect's demeanor; any actions by the suspect after the stop that may indicate a lack of coordination; the suspect's admission of alcohol consumption; and the officer's prior experience in dealing with drunken drivers. *State v. Evans* (1998), 127 Ohio App.3d 56, 63, 711 N.E.2d 761, 766, fn. 2; *State v. Sanders* (1998), 130 Ohio App.3d 789, 721 N.E.2d 433. Based upon the observations of Trooper Brock, the court finds that he possessed a reasonable and articulable suspicion to request that the defendant perform field sobriety tests at the scene.

## Probable Cause to Arrest

Because an arrest is the ultimate intrusion upon a citizen's liberty, an arresting officer must have more than a reasonable suspicion of illegal activity. The officer must have probable cause to believe that the person he detained committed a crime. Probable cause, a level of suspicion greater than reasonable suspicion, exists when a police officer at the moment of arrest is in possession of knowledge of the facts and circumstances, grounded in reasonable, trustworthy information and sufficient in themselves to warrant a belief by a reasonable and prudent police officer that an offense has been committed by the person to be arrested. See *Beck v. Ohio* (1964), 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142; *State v. Heston* (1972), 29 Ohio St.2d 152, 58 O.O.2d 349, 280 N.E.2d 376. Probable cause is a fluid concept revolving on the assessment of probabilities and particular factual contexts not readily or even usefully reduced to a neat set of legal rules. The existence of probable cause must be based upon a totality of the circumstances surrounding the incident. See *Ornelas v. United States* (1996), 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911. The assessment of probable cause must also be based upon a totality of the circumstances presented to the officer. See *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

In consideration of all the information in the possession of Trooper Brock at the time of the stop, including but not limited to the defendant's erratic driving, the observations of the defendant made at the vehicle, the poor perfor-

mance on three field sobriety tests, and the defendant's admission of alcohol consumption, the court finds that Trooper Brock possessed information sufficient to rise above the crest of probable cause so as to justify the defendant's arrest.

In making this decision, the court chooses not to include the results of the portable breath tests administered by Trooper Leitenberger, or the results of the vertical gaze nystagmus test administered by Trooper Brock in the probable cause matrix. The court finds it necessary to exclude this information from consideration because the vertical gaze nystagmus test has not been approved for usage in the state of Ohio as a tool to assess alcohol consumption. See *State v. Bresson* (1990), 51 Ohio St.3d 123, 554 N.E.2d 1330, syllabus. In addition, the court finds that the results of the portable breath test cannot be considered. The existence of precedent to the contrary, the court finds that Trooper Leitenberger failed to identify the type of device used in this circumstance and that he failed to provide the court with any foundation testimony concerning the calibration of the device to establish if the machine was operating properly on the night in question. Without this information, the court concludes that the test result fails to meet even minimal standards of reliability. While it is true that the rules of evidence do not strictly apply at suppression hearings, the court finds that the results of a scientific test may not be introduced unless there is foundational testimony that the device used was operating with a sufficient degree of accuracy.

### Probable Cause or Other Justification to Search Motor Vehicle

The state of Ohio contends that the search of the vehicle was appropriate for two reasons. First, the state claims that the search of the passenger compartment was authorized as a search incident to a lawful arrest. *New York v. Belton* (1981), 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768. However, in *State v. Brown* (1992), 63 Ohio St.3d 349, 588 N.E.2d 113, syllabus, the Ohio Supreme Court distinguished the holding in *Belton* in circumstances where the operator of the vehicle was in custody prior to the search and no other basis existed for an examination of the internal compartments of the vehicle. The court found that the justifications for a search incident to arrest, namely destruction of evidence and officer safety, were not present.

The state contends that *Brown* does not apply in this situation because there was another individual in the vehicle and that this fact heightens concern for officer safety and poses a greater likelihood that evidence could be destroyed. See, *e.g., State v. Baker* (1997), 118 Ohio App.3d 654, 657–658, 693 N.E.2d 1131, 1133.

While the court understands the concerns raised by the state, it cannot find that the presence of a passenger in these circumstances alters the application of

*Brown,* since Trooper Brock was accompanied by another officer. The evidence further establishes that a deputy of the Hancock County Sheriff's Department arrived on scene shortly after the stop to offer assistance. No testimony was presented that the passenger presented a risk of any kind. The presence of two additional officers made it unlikely that the passenger could return to the vehicle to obtain a weapon or to destroy evidence. Therefore, the court cannot conclude that the search of the vehicle compartment was justified as a search incident to arrest. See *State v. Wilkinson* (1996), 115 Ohio App.3d 411, 685 N.E.2d 590, and *State v. Davidson* (1992), 82 Ohio App.3d 282, 611 N.E.2d 889.

Second, the state contends that the warrantless search of the vehicle was fully supported by probable cause. The Fourth Amendment to the United States Constitution generally requires police to secure a search warrant before conducting a search. However, one exception to the preference for a warrant is called the automobile exception. See *United States v. Ross* (1982), 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572. Under this doctrine, if probable cause exists to conduct a search of a vehicle, no other exigency or special circumstance is required to obviate the need for a warrant. See *Maryland v. Dyson* (1999), 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442. The automobile exception is based upon two factors. First, unlike other forms of personal property, a vehicle is highly mobile and susceptible to movement and secretion. Second, vehicles traveling on public roadways are accorded less of an expectation of privacy than an individual is afforded in his or her home.

Although vehicles are excluded from the warrant requirement, a demonstration of probable cause is still necessary to justify the search of a vehicle. Probable cause to search, like probable cause to arrest, is a concept that evades precise definition. "Probable cause" is a "common-sense, [evidentiary] threshold." See *State v. Bradley* (1995), 101 Ohio App.3d 752, 756, 656 N.E.2d 721, 723. Probable cause can be ascertained from a variety of sources including an officer's observations, hearsay information received by police officers from an informant or a citizen's tip, and official police communications in the form of flyers or dispatches. See *United States v. Hensley* (1985), 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604. For purposes of the search, probable cause means that "there is a fair probability that contraband * * * will be found in a particular place." See *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548.

In this case, the only information available to Trooper Brock to support his decision to search the defendant's vehicle was the police dispatch or "bolo."

An examination of the memoranda of counsel and a review of relevant case law does not reveal the existence of any controlling precedent to answer the question

before the court: Can a police dispatch support a finding of probable cause to search a vehicle for weapons?

In a similar context, police dispatches have justified the stop of vehicles so long as the state can demonstrate that the facts precipitating the dispatch would support a finding of reasonable suspicion of criminal activity. *United States v. Hensley; Maumee v. Weisner* (1999), 87 Ohio St.3d 295, 297–298, 720 N.E.2d 507, 510–512. This requirement mandates that the examining court scrutinize the source and content of the information to determine its degree of reliability. *Alabama v. White* (1990), 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301. If the source of the information is an identified citizen who has witnessed or been the victim of a crime, the information or tip is presumed reliable if the person relates his or her basis of knowledge. *Weisner*, 87 Ohio St.3d at 300–301, 720 N.E.2d at 513. Police broadcasts have also been found sufficiently trustworthy so as to establish probable cause to make an arrest. *State v. Fultz* (1968), 13 Ohio St.2d 79, 42 O.O.2d 259, 234 N.E.2d 593. Information supplied by a girlfriend was found to justify the warrantless search of a suspect's travel bag for weapons. See *State v. Bradley, supra.*

While not exactly on point, the logic of these decisions leads the court to conclude that a sufficiently detailed police dispatch from a citizen informant could support a finding of probable cause to conduct a motor vehicle search.

However, the inquiry does not end there. The court must in this case scrutinize the source and content of the information to determine whether it could support a finding of probable cause to search. Thus, the court must analyze the information supplied to Officer Tuttle by Mrs. Oswald and her companions.

In great detail, Oswald outlined for Officer Tuttle the events that led to her complaint and provided him with a description of the motor vehicle and the license plate of the person that she claimed had menaced her earlier in the evening. She also provided Officer Tuttle with her name, address, and a written statement. Her daughter and a friend confirmed Oswald's recollection of the incident. Officer Tuttle testified that he had no reason to doubt Oswald and no other evidence was adduced at the hearing to cast doubt upon her credibility.

As an identified citizen informant, Oswald provided Officer Tuttle with specific details of criminality and the circumstances surrounding her knowledge of them. Therefore, upon independent examination, the court finds that this detailed and credible information, which precipitated the police dispatch relied upon by Trooper Brock, established probable cause for the search of the defendant's motor vehicle.

### *Miranda* Warnings

In his motion to suppress, the defendant alleged that certain incriminating statements were elicited from him after he was arrested, but prior to receiving his *Miranda* warnings as required. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. A review of the record indicates no such statements were made. The court finds, therefore, that there are no potential *Miranda* warning violations to entertain.

### Conclusion

Based upon all the foregoing, the court finds that none of the branches of the defendant's motion to suppress evidence are well taken. The motion is therefore overruled in total.

This matter is ordered set for trial.

*Motion denied.*